## HEALTH

### LIFE-SUSTAINING PROCEDURES — INTERPRETATION OF HEALTH CARE DECISIONS ACT

June 1, 1993

*The Honorable William Donald Schaefer*
*Governor of Maryland*

We are writing to discuss a number of interpretive issues presented by Chapter 372 (House Bill 1243) of the Laws of Maryland 1993, which adds to the Health-General Article of the Maryland Code ("HG" Article) a new "Health Care Decisions Act," effective October 1, 1993. We had previously addressed many of these issues in our bill review letter of May 7, 1993, in which we approved the legislation for constitutionality and legal sufficiency. Because of the importance of the Act and our desire to give wide circulation to these interpretations of it, we are reissuing the bill review letter in this revised format, with additional discussion.

### I

### Background

Chapter 372 is a comprehensive reform of health care decision making law in Maryland.[1] It has four major components: provisions on advance directives that expand the means by which an individual may make decisions about future medical contingencies and that confirm an individual's right to designate a health care agent; provisions that authorize surrogate decision making on behalf of

---

[1] The law as it existed prior to the enactment of Chapter 372 is discussed in *Mack v. Mack*, 329 Md. 188, 618 A.2d 744 (1993), with respect to life-sustaining treatment issues in a guardianship for a patient in a persistent vegetative state, and in two earlier Opinions of the Attorney General, 73 *Opinions of the Attorney General* 162 (1988) and 75 *Opinions of the Attorney General* 253 (1990) with respect to life-sustaining treatment issues generally.

incapacitated patients who did not designate a health care agent, subject to certain standards and limitations; provisions that establish standards and procedures for life-sustaining treatment issues in guardianship cases; and provisions that specify certain rights, duties, and immunities of health care providers.

This legislation was the subject of intense debate even before the Session began, very exacting attention from the House Environmental Matters and Senate Judicial Proceedings Committees, and an ultimate compromise that incorporated elements of one bill into another.[2] The Health Care Decisions Act gives primacy, as it must, to an individual's constitutionally protected right to health care autonomy.[3] The Act also reflects the policy judgment that family and other "surrogate decision makers" should have broad, but not limitless, authority to make decisions on behalf of patients who are unable to decide for themselves and who did not choose a decision maker in an advance directive. Further, the Act respects the professional integrity of physicians and other health care providers by, for example, codifying a physician's right to decline to provide

---

[2] The legislative history warrants further brief explanation. Four comprehensive bills on the subject of health care decision making were introduced in the 1993 Session: House Bill 1243 and Senate Bill 676, identical bills that largely reflected the recommendations of a drafting group working under the auspices of the Conference of Circuit Judges and chaired by Judge John Carroll Byrnes; and House Bill 1432 and Senate Bill 664, similar bills that reflected the recommendations of a drafting group chaired by Professor Diane Hoffmann, of the University of Maryland Law School.

The House and the Senate then decided to craft compromise legislation, using as a starting point the texts of House Bill 1432 and Senate Bill 664. Eventually, the compromise was embodied in House Bill 1243, which you signed into law as Chapter 372, and Senate Bill 664, which you vetoed.

[3] In *Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261 (1990), all of the Justices save one accepted the premise that a competent patient's right to refuse life-sustaining treatment was a protected "liberty" interest under the Fourteenth Amendment. In *Mack v. Mack*, the Court of Appeals found that the right to refuse treatment was a common law right, and therefore the Court "found no need to opine beyond a common-law analysis ...." 329 Md. at 211.

"ethically inappropriate" or "medically ineffective" treatment.  HG §5-611.[4]

Yet the Act retains an overall balance through its articulation of standards and a series of provisions that protect patients against potentially harmful decisions by others.  For example, health care providers have a specific duty to act to protect an incapacitated patient if an instruction to withhold or withdraw a life-sustaining procedure is believed to be "inconsistent with generally accepted standards of patient care ...." HG §5-612(a).  The balanced approach desired by the Legislature is reflected in a preamble, which states that the intent of the Act is to ensure an individual's right to "personal health care decision making"; to honor the societal value that every individual's life "has worth in and of itself, and is not to be devalued by reason of an individual's incapacity or perceived diminished 'quality of life' ..."; and to afford "reasonable safeguards" so that decision making on behalf of incapacitated persons is focussed solely on their wishes and interests.

With an eye toward these overall legislative goals, this opinion is intended to resolve certain issues of interpretation that have arisen since the passage of the Act.[5]

_____

[4] This grant of authority to physicians is subject to an exception when a patient or other authorized decision maker instructs that life-sustaining procedures be provided.  HG §5-613(a)(3).

[5] We have also identified two minor textual errors in Chapter 372, which should be addressed in next year's corrective bill:

> 1.  The bill contains an erroneous cross-reference.  On page 36, in line 13, "§5-606(c)" should read "§5-605(c)."
>
> 2.  On page 32, in line 21, the word "result" should read "results."

## II

### "End-Stage Condition"

An individual may use an advance directive, written or oral, to decide against the use of life-sustaining procedures under three circumstances: "terminal condition," "persistent vegetative state," or "end-stage condition." A surrogate's authority to withhold or withdraw life-sustaining procedures likewise is limited to those three circumstances, as certified by two physicians. HG §5-606(b).[6]

The most familiar of these terms, because it is used and defined in the current Living Will Law, is "terminal condition." Under the definition in HG §5-601(q), just as under current law, a patient may not be certified to be in a "terminal condition" unless two physicians agree that death from an incurable condition is "imminent."[7]

The term "persistent vegetative state" is new to Maryland law but is a well-established clinical term. As defined in HG §5-601(o), a "persistent vegetative state" exists only if the patient "has suffered a permanent loss of consciousness, exhibiting no behavioral evidence of self-awareness or awareness of surroundings ...."[8] As the Court of Appeals described the condition in *Mack v. Mack*, 329 Md. 188, 192, 618 A.2d 744 (1993):

> The distinguishing feature of a patient in a persistent vegetative state is wakefulness

---

[6] A health care agent's authority to withhold or withdraw life-sustaining procedures may be limited by the individual who appoints the agent to those three circumstances or any others, but the agent's authority is not so limited by the statute. *See* HG §§5-602(b)(1) and 5-606(b).

[7] For a discussion of the meaning of the undefined term "imminent," *see* 73 *Opinions of the Attorney General* at 168.

[8] The definition, recognizing that different causative factors will require different periods of observation and testing before this diagnosis can be made with confidence, calls for "the passage of a medically appropriate period of time" before a certification that the condition truly is irreversible. HG §5-601(o)(2). The certification process for persistent vegetative state requires the participation of one physician with "special expertise in the evaluation of cognitive functioning ...." HG §5-606(b)(2).

without awareness. These patients commonly make sporadic movements, spontaneously blink their eyes, and have heightened reflex responses, but they cannot voluntarily respond to stimuli.

The last of the three categories, "end-stage condition," was perhaps the most controversial element in the legislation and therefore was the object of special legislative focus. Ultimately, the definition was framed in HG §5-601(i) as follows:

> "End-stage condition" means an advanced, progressive, irreversible condition caused by injury, disease, or illness:
>
> (i) That has caused severe and permanent deterioration indicated by incompetency and complete physical dependency; and
>
> (ii) For which, to a reasonable degree of medical certainty, treatment of the irreversible condition would be medically ineffective.

Unlike a patient in a terminal condition, a patient in an end-stage condition does not face "imminent" death, although the condition must be "advanced, progressive, and irreversible." And unlike a patient in a persistent vegetative state, a patient in an end-stage condition does not suffer a total loss of consciousness, although the condition must have caused "severe and permanent deterioration."

The hallmarks of this deterioration are specified: "incompetency" and "complete physical dependency." The term "incompetency" is not defined, but in context it refers to the patient's inability to understand or evaluate treatment issues. *See* HG §5-601(1) (definition of "incapable of making an informed decision").

The meaning of the key phrase "complete physical dependency" should be understood in light of the overall purpose of the definition of "end-stage condition": to describe those patients

who are suffering from progressive and incurable diseases like Alzheimer's disease or AIDS and on whom the disease has already exacted a severe toll. The "end-stage" of such diseases will have arrived only when the patient's physical deficits are such that the patient is generally unable to perform independently a broad range of activities of daily living. According to the Senate Floor Report on House Bill 1243, the Senate's intent in insisting on the language "*complete* physical dependency" was "to emphasize that the category of 'end-stage condition' only applies to patients who have suffered severe and permanent generalized infirmity from an untreatable irreversible condition."

Thus, on the one hand, a patient with Alzheimer's disease who needs help with some aspects of personal care but who is able to engage in other activities independently is not in an "end-stage condition." On the other hand, an Alzheimer's disease patient who has deteriorated to the point where the patient needs help in *all* aspects of personal care might be determined to be in an "end-stage condition."[9] A representative of the Medical and Chirurgical Faculty of Maryland well summarized the legislative objective underlying this language:

> With regard to the "end-stage condition" definition, the use of "complete" to modify "physical dependency" is evidently aimed at describing victims of Alzheimer's Disease and other conditions, who are bed-ridden and suffering from a generalized infirmity that will not improve. A physician who is asked to evaluate whether a patient has experienced "complete physical dependency" would look to the range of ordinary physical abilities and assess the patient's ability to conduct them independently.

Letter to Delegate Stephen J. Braun from Angus R. Everton, Esquire (April 2, 1993).

---

[9] HG §19-301(k) contains an itemization of "personal care" activities that can guide physicians in assessing whether a patient's deterioration has reached the stage of "complete physical dependency."

Finally, treatment of the underlying condition must be "medically ineffective." If a treatment would likely "prevent or reduce the deterioration" in the patient's health that the condition would otherwise cause, then the patient is not in an "end-stage condition." *See* HG §5-601(n) (definition of "medically ineffective treatment"). But if the underlying condition is, in the phrase of the Senate Floor Report, "untreatable," the last element of the definition will have been met.

## III

### Clarifications in Forms

Chapter 372 repeals the current Living Will Law and creates a new type of health care planning instrument called an "advance directive." The advance directive encompasses both documents that contain instructions, like a living will, and documents that select a decision maker, like a durable power of attorney for health care. No particular form is required; the only formality is the requirement for two witnesses to a written advance directive.[10] The Act "grandfathers" existing documents: All existing living wills, durable powers of attorney for health care, and similar documents remain valid. HG §§5-614(d) and 5-616(b).

Although no forms are required, the Act provides optional forms as an accommodation to those who do not wish to have documents drafted by a lawyer. The first of the two optional forms, called "Form I," is a more traditional living will, intended as a limited instructional document for decisions about life-sustaining procedures in the event of terminal condition or persistent vegetative state (not for end-stage condition). The other optional form, called "Form II," contains two parts: Part A allows for the appointment of

---

[10] The witness requirements are significantly more relaxed than under the current Living Will Law. Under HG §5-602(c), "any competent individual" may witness an advance directive, "including an employee of a health care facility or physician caring for the [patient] if acting in good faith." Only a health care agent for the patient is flatly barred from serving as a witness, although at least one of the two witnesses to a written advance directive must be financially disinterested. An oral advance directive must be made in the presence of the patient's attending physician and one witness. HG §5-602(d).

a health care agent; Part B gives instructions about health care issues, including decisions about life-sustaining procedures in the event of terminal condition, persistent vegetative state, and end-stage condition.

An inadvertent misplacement of certain language, however, might lead to confusion about the scope of these two optional advance directive forms. The language in question deals with the issue of pregnancy and its potential effect on decision making in an advance directive.

Under the current Living Will Law, a living will may not be implemented if an otherwise qualified patient is pregnant. HG §5-605(2). In its provisions on advance directives, Chapter 372 reflects a policy decision to eliminate this kind of mandatory provision and instead allow a woman to decide for herself whether pregnancy would have any effect on decision making under an advance directive. The Floor Report on House Bill 1243 explains that "[e]ach form contains a provision allowing a woman to provide specific instructions to a health care agent or to a health care practitioner as to how to proceed if she is pregnant at the time the advance directive becomes effective."

The text of the optional forms in Chapter 372 does not properly carry out this objective. As explained above, Form I, the living will is not a document by which an individual appoints a health care agent. Yet on page 37, lines 25-26 of Chapter 372, Form I contains the following language: "If I am pregnant my agent shall follow these specific instructions: ...." This language is in the wrong place; it actually belongs in Part A of Form II, which is the optional form for appointment of a health care agent. In the living will form, Form I, the same language should have been set out as correctly appears in Part B of Form II (page 40, lines 40-41): "If I am pregnant, my decision concerning life-sustaining procedures shall be modified as follows: ...." Had this language appeared as well in Form I, the legislative purpose of having "[e]ach form" contain an opportunity for instructions about pregnancy would have been effectuated.

When the Attorney General's Office distributes to the public the optional statutory forms, we intend to correct the forms so that the intended language appears in each place, thus reflecting the

actual legislative purpose. *See Kaczorowski v. City of Baltimore*, 309 Md. 505, 525 A.2d 687 (1987). We suggest that the law be amended next session to correct the error.

One other provision in the optional forms needs clarification. Part B of Form II allows a declarant to make a range of health care decisions, including a decision about medication for the relief of pain: "I direct that no matter what my condition, medication not be given to me to relieve pain and suffering, if it would shorten my remaining life." The antecedent of the pronoun "it" is not entirely clear from the sentence structure. The intention is to refer to the administration of medication. That is, some medications for the relief of pain have the effect of depressing respiration and therefore of increasing the risk of an earlier death than would occur if the medication were not administered. This provision in the form allows an individual to choose to forgo pain relief if the medication would likely present that risk. An individual who does not initial that provision will be opting for the provision of pain relief in accordance with customary medical practice.

## IV

### Surrogate Decision Making

#### A.    *Guardian as Surrogate*

HG §5-605(a)(2) contains the following priority ranking of surrogate decision makers:

> (i)   A guardian for the patient, if one has been appointed;
>
> (ii)  The patient's spouse;
>
> (iii)    An adult child of the patient;
>
> (iv)  A parent of the patient;
>
> (v)   An adult brother or sister of the patient; or

(vi) A friend or other relative of the patient who meets the requirements of paragraph (3) of this subsection.[11]

A surrogate decision maker is generally authorized to make health care decisions for a patient "who has been certified to be incapable of making an informed decision and who has not appointed a health care agent ...." HG §5-605(a)(2). Someone who is ranked lower in the priority order may make a decision "only if all individuals in the next higher class are unavailable." *Id.* Thus, "[a] guardian for the patient, if one has been appointed," trumps all other potential surrogates.

In our view, the term "guardian for the patient" means a guardian of the person of the patient to whom the court has given power to consent to medical care under §13-708(b)(8) of the Estates and Trusts Article ("ET" Article).[12] The court is instructed by statute to grant the guardian "only those powers necessary to provide for the demonstrated need of the disabled person." ET §13-708(a). A court's decision not to grant a guardian power over health care matters, therefore, reflects a determination that the exercise of such power by the guardian is *not* necessary for the needs of the disabled person. Moreover, "[t]he administration of guardianship affairs remains subject to judicial control by the equity court that appointed the guardian." *Mack v. Mack*, 329 Md. 188, 201, 618 A.2d 744 (1993). *See also Kircherer v. Kircherer*, 285 Md. 114, 118, 400 A.2d 1097 (1979). The General Assembly cannot reasonably be taken to have undermined this fundamental principle by giving authority to a guardian to act on health matters when the court itself chose not to grant such authority.

As we read it, the priority among surrogates assigned the guardian by HG §5-605(a)(2)(i) is predicated on the court's grant of authority over health care matters to the guardian. If a guardian of

---

[11] The "requirements of paragraph (3)" refer to an affidavit demonstrating "the specific facts and circumstances" of "regular contact with the patient sufficient to be familiar with the patient's activities, health, and personal beliefs." HG §5-605(a)(3)(ii).

[12] Someone who is only a guardian of *the estate* of a disabled person is not a "guardian for the patient" within the meaning of HG §5-605(a)(2).

the person has not been given power over health care matters pursuant to ET §13-708(b)(8), another surrogate, if one is available, may make health care decisions for the patient. If no surrogate is available, the guardian of the person should seek to be granted power under ET §13-708(b)(8).

Our construction − that the priority rank among surrogates accorded to the guardian does not give the guardian any authority beyond that granted by the court − by no means renders the surrogate priority provision meaningless. The priority avoids potential confusion if someone lower in the priority list is the guardian. Suppose, for example, that the patient's spouse is available to make health care decisions, but the patient's parent is the guardian of the person of the patient, vested by the court with authority to make such decisions. Ordinarily, the spouse has priority over a parent. In this example, however, the priority accorded the guardian by HG §5-605(a)(2)(i) ensures that the parent will be the recognized decision maker.

Furthermore, the designation of the guardian as surrogate ensures that the guardian is subject to proper standards when making health care decisions generally. Although Chapter 372 contains detailed provisions governing the responsibility of the guardian and the court when issues about life-sustaining procedures arise, neither the new law nor existing statutory provisions about guardianship delineate standards for the other kinds of health care decisions encompassed by ET §13-708(b)(8). The designation of the guardian as surrogate means that the guardian, like all other surrogates, is subject to the standards in HG §5-605(c). These standards require a surrogate to base decisions solely "on the wishes of the patient and, if the wishes of the patient are unknown or unclear, on the patient's best interest"; and, conversely, to refrain from basing decisions about life-sustaining procedures on the patient's "pre-existing, long-term mental or physical disability, or ... economic disadvantage."[13]

---

[13] With respect to life-sustaining procedures, the guardian is subject not only to these standards but also the requirements of ET §13-708(c) and any conditions imposed by the court. *See* Part VII below.

## B.    *Disputes Among Surrogates*

If individuals with equal claim to be surrogates disagree about a health care decision on behalf of an incapacitated patient and the patient is in a facility with a patient care advisory committee, the dispute must be referred to the committee by the patient's attending physician or a surrogate.  HG §5-605(b).[14]  The subsection goes on to provide that the attending physician "may act in accordance with the recommendation of the committee or transfer the patient in accordance with the provisions of HG §5-613 of this subtitle."

When the initial Senate version of the Health Care Decisions Act, Senate Bill 664, was introduced, this provision was drafted as a mandate:  The physician "shall act in accordance with the recommendation of the committee or transfer the patient ...." Senate Bill 664, page 16, line 25.  Under this language, the physician would have been obliged to do one thing or the other.  After objections from those who believed that such a mandate was inconsistent with the advisory nature of these committees, the word "shall" was changed to "may," as it was in House Bill 1432, the initial House version of the Health Care Decisions Act.  As a result, the physician is not obliged to do either; the physician may accede to the committee's recommendation (in which case HG §5-605(b) accords the physician limited immunity), transfer the patient, or take any other action authorized by law.

### V

### EMS "Do Not Resuscitate Orders"

The bill contains a provision, HG §5-608, authorizing certified emergency medical services personnel to follow certain "emergency medical services 'do not resuscitate orders.'"  One of the circumstances under which these DNR orders are to be followed is "in accordance with protocols established by the Maryland Institute for Emergency Medical Services Systems in conjunction with the State Board of Physician Quality Assurance." HG §5-608(a). Under

---

[14] Hospitals and related institutions are required by law to establish patient care advisory committees.  HG §19-371(a).  Chapter 372 does not affect the right of any "petitioner" to bring a matter to the committee. *See* HG §§19-370(d), 19-373(a), and 19-374(a).

Chapter 592 (House Bill 1222) of the Laws of Maryland 1993, these "protocols" would be developed by the new State Emergency Medical Services Board. *See* §13-1D-09(a) and (b)(1)(ii) of the Education Article (to be effective October 1, 1993).

The other two circumstances under which emergency medical services personnel are to follow these DNR orders involve oral orders by a physician, either an on-line command and control physician or a physician physically present on the scene with the patient. HG §5-608(c)(2) and (3). Although this provision authorizes EMS personnel to follow the physician's orders in such circumstances, it does not itself provide any new authority to the physician to issue such an order. A physician who issues a DNR order to EMS personnel must have a basis for doing so elsewhere in the bill − for example, if the physician were implementing the patient's prior oral advance directive.

## VI

### Distribution of Information

HG §5-615 requires every "health care facility," as defined in HG §19-101, to "provide each individual on admittance to the facility information concerning the rights of the individual to make decisions concerning health care, including the right to accept or refuse treatment, and the right to make an advance directive, including a living will."[15]

Under the federal Patient Self-Determination Act, hospitals, nursing homes, health maintenance organizations, home health agencies, and hospices that receive Medicare or Medicaid funds must provide comparable information to their patients. *See* §§4206

---

[15] The title of House Bill 1243 does not contain explicit language reflecting this provision. (By contrast, in the title of Senate Bill 664, this provision was reflected explicitly in the phrase "requiring a health care facility to provide certain information.") However, the title of House Bill 1243 does refer to "establishing certain duties of health care providers under certain circumstances." Page 2, lines 38-39. Because a health care facility is a "health care provider," *see* HG §5-601(k), the title reference in House Bill 1243 is constitutionally sufficient, in our judgment.

and 4751 of the Omnibus Budget Reconciliation Act of 1990, Pub. L.No. 101-508; 57 Fed. Reg. 8194 (March 6, 1992). The apparent purpose of HG §5-615 is to extend the requirements of the federal Act to all health care facilities. For example, an "ambulatory surgical facility" is a "health care facility" as defined in HG §19-101(e)(1)(iii) and is therefore covered by the new information disclosure requirement, even though such facilities are not covered by the federal Act.

In our view, a health care facility that already complies with the federal Patient Self-Determination Act need take no additional actions in order to comply with HG §5-615 as well. A facility that is not covered by the federal Act but will be required after October 1, 1993, to comply with HG §5-615 may look to the federal Act and its regulations for guidance. An out-patient facility covered by HG §5-615, for example, will comply if it makes the required information available to patients when they initially receive care.

This office will be drafting, and circulating for comment, a revision of the summary of State law required by the Patient Self-Determination Act, to account for the changes in Maryland law brought about by this legislation.

## VII

### Standards for Guardians

Under current law, a guardian of the person is required to obtain authorization from the court prior to consenting to the provision, withholding, or withdrawal of a "medical procedure that involves, or would involve, a substantial risk to the life of the disabled person." ET §13-708(c). This provision has been understood to mean that a court must review contemporaneously the guardian's proposed decision about the particular life-sustaining treatment, even though the guardian might have been authorized initially to decide all health care issues for the ward. Chapter 372 adds the following exception to this general requirement:

The court may, upon such conditions as the court considers appropriate, authorize a guardian to make a decision regarding medical procedures that involve a substantial risk to life without further court authorization, if:

(i) The disabled person has executed an advance directive in accordance with Title 5, Subtitle 6 of the Health-General Article that authorizes the guardian to consent to the provision, withholding or withdrawal of a medical procedure that involves a substantial risk to life but does not appoint a health care agent; or

(ii) The guardian is also the disabled person's spouse, adult child, parent, or adult brother or sister.

ET §13-708(c)(2). The phrase "*further* court authorization" implies that the court may grant this authorization prior to the time that the actual treatment decision must be made. For example, the court might include in the order appointing a guardian a provision authorizing the guardian to decide certain issues about life-sustaining procedures. If the court chose to do so, the guardian would not need to file a subsequent petition seeking the court's authorization for a decision within the scope of the initial order.

The first of the two subparagraphs describing the circumstances when the court may permit this advance authorization describes a pertinent decision made by the now disabled person in an advance directive. The responsibility of the guardian under such circumstances is that of any other decision maker when an individual has executed an advance directive – to carry out the wishes of the individual as expressed in the document.

The question has arisen, however, as to the standards applicable to the decision of a guardian who has been given advance authorization by the court because of the guardian's status as "the disabled person's spouse, adult child, parent, or adult brother or sister." To be sure, such a guardian is subject to whatever conditions "the court considers appropriate." Nevertheless, the question is

whether the guardian would be subject to any statutorily defined standard apart from the conditions imposed by the court, if, for example, a court's advance authorization were silent about decisional standards.

A patient's spouse, adult child, parent, or adult brother or sister is given priority in the classes of surrogate decision makers set out in HG §5-605(a)(2). The amendment to ET §13-708(c) reflects a legislative judgment that, in effect, these close family members may be permitted by the court to act in their capacity as surrogate decision makers. In our view, then, these guardians are subject to the standards for surrogate decision making set out in HG §5-605(c), whether or not the court imposes any conditions.[16] A reading of the provision that would permit these guardians to act on any other basis would be inconsistent with the General Assembly's intent, expressed in the preamble, "that this Act advance the interests and wishes of the individuals whose life and health may be affected by its provisions, not the interests and wishes of others, including those who are granted authority under this Act to act on behalf of an individual."

## VIII

### Conclusion

When this office first undertook its involvement in issues relating to life-sustaining treatment, we wrote that "[t]hese decisions are forged out of personal emotions, medical and ethical judgments, and religious beliefs. No opinion of the Attorney General can really go to the heart of the matter." What we could do, we said, was "to make clear how the law affects this most private and deeply felt of decisions." 73 *Opinions of the Attorney General* 162 (1988).

The Health Care Decisions Act is an important reform that clarifies the law and thereby removes at least some small burden from the patients, families, and health care providers who face these decisions daily. The Attorney General's Office is proud of its role in the development and enactment of this legislation. We look

---

[16] *See* note 13 above and accompanying text.

forward to a common effort to make the new law work as the Legislature intended.

J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
*Opinions & Advice*